UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM F. HENRY,

               Plaintiff,

    v.

BRANDON ATOCH,  CITY OF
OAKVILLE, GRAYS HARBOR
COUNTY, SHERIFF MICHAEL J
WHELAN, DEPUTY GAY, DEPUTY
WELLS, DEPUTY RAMIREZ, GRAYS
HARBOR COUNTY SHERIFF'S
DEPARTMENT,

               Defendant.

CASE NO. C11-5740 RJB

ORDER ON GRAYS HARBOR
COUNTY DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

     This matter comes before the court on Grays Harbor County Defendants' [Grays Harbor County, and Grays Harbor County Sheriff Deputies Richard Ramirez, Daniel Wells and Tracy Gay] Motion for Summary Judgment.  Dkt. 54.  The court has reviewed the relevant record and the remainder of the file herein.

<u>RELEVANT FACTS</u>

This case arises from the arrest of plaintiff William Henry on February 19, 2010, for felony harassment. Dkt. 23 at 3 and at 5. *See also* Dkt. 7 at 8-9. Brandon Atoch, the then-Mayor of Oakville, Washington, contacted law enforcement about an interaction he had had with Mr. Henry on February 18, 2010. On February 19, 2010, Deputies Richard Ramirez, Daniel Wells, and Tracy Gay talked with Mr. Atoch and Dan Thompson.

In his report, Deputy Ramirez stated as follows:

> On 02-19-2010 I was assigned patrol duties for Grays Harbor County. At approximately 0930 hours I responded to Oakville City Hall regarding a threats complaint reported by Oakville Mayor Brandon Atoch.
>
> Deputy Wells and I arrived, on-scene at 0941 hours and contacted Mayor Atoch. Mayor Atoch advised us that on 02-18-2010 at 1830 hours William F. Henry approached him at the drive to his residence. Mayor Atoch stated Henry was upset about issues with the City of Oakville and began to confront the Mayor about these issues. Mayor Atoch stated Henry made a threatening comment to him about Dan Thompson who is the Director of Public Works for the City of Oakville. Mayor Atoch said Henry stated, "If Dan Thompson ever steps foot on Black Hills Wrangler's Rodeo Grounds again I'll "Fucking" shoot him and call you to come pick up his "fucking" dead body." Mayor Atoch stated he felt threatened by the comment. He stated Henry's face was red and that Henry was yelling and pointing at him when he made the threat. Mayor Atoch stated he was concerned for he [sic] and his family's safety because Henry had come over to his residence to confront him about city issues. Mayor Atoch informed me this was not the first time Henry had made threatening comments towards city employees. He said this was an ongoing issue since he took office about six weeks ago. Mayor Atoch stated Henry had mailed several harassing letters to City Hall about the water service in Oakville. I obtained a signed statement from the mayor and copies of Henry's letters.
>
> As Deputy Wells and I were talking to the Mayor, Dan Thompson was sitting at his desk completing a statement. Thompson advised us that he had received several threats from Henry in the past. He recalled an incident in 2006 while he was repairing a water line Henry had approached him making threats to shoot Thompson if he did not stop repairing the water line. Thompson stated he immediately called the Oakville Police to report the incident. Thompson stated he was very concerned for his safety after he received a phone call from the Mayor informing him about the threat that was made against him. Thompson also stated he felt the threats were affecting the performance of his duties for the City of Oakville.

Dkt. 23, at 4-5.

1    The deputies obtained statements from Mr. Atoch and Mr. Thompson that were

2  consistent with Deputy Ramirez's report.  Dkt. 23, at 6-9.

3    Deputies Ramirez, Wells, and Gay then contacted Mr. Henry at Mr. Henry's home. Dkt.

4  58, at 14. According to Mr. Henry, the deputies pounded on the front door of his house; he

5  opened the door; and the deputies were standing out in his front yard.  Dkt. 58, at 14.

6     In his report, Deputy Ramirez stated that Mr. Henry told the officers that "the

7  conversation between [Mr. Atoch and Mr. Henry] became heated and words were exchanged.

8  Henry stated the "F" word was said several times but that he could not recall the whole

9  conversation." Dkt. 23, at 5.

10    In a declaration filed on March 13, 2012, Mr. Henry stated that he never threatened to kill

11  or cause bodily harm to Mr. Atoch, but he did not deny making the threatening statement to Mr.

12  Atoch regarding Mr. Thompson. Dkt. 29 at 3.  In a declaration filed on April 16, 2010, Mr.

13  Henry stated that his conversation with Mr. Atoch, "became heated.  However, I never

14  threatened to kill or cause bodily harm to Defendant Atoch or Dan Thompson."  Dkt. 43, at ¶ 4.

15    Mr. Henry testified at his deposition as follows:

16         Q  Did you come out onto your front porch?
          A  Yes.
17         Q  Describe for me what happened next.
          A  We talked for quite a while I was inside and had no shoes on.  And I
18    went to put some shoes on and stepped out onto the porch and that's when Ramirez
      grabbed me by the arm and threw handcuffs on me.
19         Q  So you went and got some shoes, came out on your front porch?
          A  Yes.
20         Q  And then you said Deputy Ramirez grabbed you by the arm?
          A  Ramirez had followed me in the house when I put the shoes on.  He walked in
21    through my front room into the kitchen area when he was ordered to get out of my house.

22  Dkt. 58, at 14.

23

24

1      Mr. Henry stated that, after he put his shoes on, he looked up, saw Deputy Ramirez

2  standing there, and told him "to get his beaner ass out of my house."  Dkt. 58, at 14.

3      In a declaration, Deputy Ramirez denied that he entered Mr. Henry's house on February

4  19, 2010.  Dkt. 56.

5      Mr. Henry testified at his deposition that Deputy Ramirez "grabbed me by the arm,

6  twisted it behind my back and started snapping bracelets on"; that "[h]e twisted my arm up and

7  basically shoved me off of my property out to his patrol car parked in the city right-of-way;"

8  that "[h]e grabbed me, twisted my arms around and stuffed me in the back of that cop car quick";

9  and that "[h]e forced me into the backseat, threw a seat belt on me, and walked around the patrol

10 car and we drove off.  (Dkt. 58, at 15-16).

11      Deputy Ramirez stated in his report of the incident that he "advised Henry he was under

12 arrest for felony harassment" and then placed Mr. Henry into the patrol car.  Dkt. 23, at 5.

13      Mr. Henry testified in his deposition that, after he had been placed in Deputy Ramirez's

14 patrol car, Deputies Wells and Gay went inside his house.

15          Q  And your testimony is that once they went inside the front door, you don't
              know what they did.
16          A  That's correct.  We left.
            Q  Do you know how long they were inside your front door?
17          A  I was in the patrol car heading to Montesano.  So I have no idea what they
              done, what their purposes was.
18          Q  Or how long they were in there?
            A  Exactly.  I was removed from the scene.
19
   Dkt. 58, at 16.
20
21      In a declaration, Mr. Henry stated that "[t]he Deputies entered my home without a search

22 warrant or permission from me."  Dkt. 29, at 4.  However, Deputy Wells stated as follows:

23          After Mr. Henry was arrested on February 19, 2010, and he was in the back of Deputy
            Ramirez's patrol car, he got my attention and asked about his medication.  I asked him
            where it was and he said it was inside his house on the kitchen table or the bar.  I went
24

inside his house at his request to try and locate his medication. I looked in the two places he indicated and did not see his medication. I returned to the patrol vehicle and informed Mr. Henry that I could not find the medication. I suggested he call someone from the Jail regarding his medication or inform the Jail. I did not enter his residence for any other reason or at any other time during the incident.

Dkt. 57, at 1.

Deputy Gay stated that he did not enter Mr. Henry's residence on February 19, 2010. Dkt. 55. Two of Mr. Henry's neighbors stated in declarations that they saw two deputies enter Mr. Henry's house while Mr. Henry was in the back seat of the patrol car. Dkt. 54 and 55.

Mr. Henry was then transported to the Grays Harbor County Jail. Dkt. 23 at 5.

Mr. Henry was booked into the jail on Friday, February 19, 2010. Dkt. 58, at 18. He did not have his blood pressure medication with him and the jail did not provide him with the medication on February 19, 20 and 21, 2010, while he was incarcerated. Mr. Henry did not request medical care at booking, although he stated that "I don't believe I was given that option." Dkt. 58, at 18. However, he signed the booking form answering "No" to the question "Does inmate request medical care?" Dkt. 58, at 18. Mr. Henry stated in his deposition that he requested medical attention while he was in the jail, and that his blood pressure was taken twice. Dkt. 58, at 19. Mr. Henry stated that he was told by a jail employee that he would have to wait until Monday to see a physician and have medication prescribed for him. Dkt. 58, at 19. Mr. Henry also stated in his deposition that no physician has told him that missing three days of his medications caused him any medical complications or caused the need for his surgery. Dkt. 58, at 20. Mr. Henry testified in his deposition that he has a "personal basis" for believing that his aortic-valve replacement surgery was caused by the lack of medication while he was in the jail. Dkt. 58, at 20.

On February 20, 2010, the Grays Harbor Superior Court found that there was probable cause to determine that Mr. Henry had committed the offense of disorderly conduct. Dkt. 23, at 10.

On Monday, February 22, 2010, Mr. Henry was released after the Prosecuting Attorney for Grays Harbor County dismissed the charges without prejudice. Dkt. 23, at 11.

Mr. Henry testified in his deposition that he owns 25 guns and that he would secure his property with force if necessary. Dkt. 58, at 22.

PROCEDURAL HISTORY

On August 23, 2011, this case was filed in Grays Harbor Superior Court. Dkt. 1, at 3. On September 15, 2011, the case was removed to federal court, on the basis of federal question jurisdiction under 42 U.S.C. § 1983. Dkt. 1.

The complaint alleged the following causes of action: (1) defamation; (2) constitutional violation for arrest without a warrant and without probable cause to support a charge of felony harassment; (3) constitutional violation for entry into Mr. Henry's residence at the time of the arrest, without a warrant or permission; (4) constitutional violation for entry into Mr. Henry's residence after the arrest, without a warrant or without permission; and (5) state law claims for wrongful arrest, wrongful search before and after the arrest, denial of bail, negligence, false imprisonment, and assault and battery. Dkt. 1.

Several claims against various defendants have been dismissed. *See* Dkts. 35 and 48. The remaining claims are as follows: (1) *Federal Claims*: violation of constitutional rights by arrest without a warrant and without probable cause by Deputies Ramirez, Wells and Gay; violation of constitutional rights by search without a warrant at the time of arrest by Deputy Ramirez; and violation of constitutional rights by search without a warrant after arrest by Deputies Wells and

Gay; and (2) *State Law Claims*: wrongful arrest without a warrant and without probable cause against Deputies Ramirez, Wells and Gay; wrongful search at the time of arrest against Deputy Ramirez; denial of bail against Grays Harbor County; wrongful search after arrest against Deputies Wells and Gay; negligence against Grays Harbor County; false imprisonment against Grays Harbor County and Deputies Ramirez, Wells and Gay; and assault and battery against Deputy Ramirez.

<u>MOTION FOR SUMMARY JUDGMENT</u>

On May 31, 2011, the Grays Harbor defendants filed a motion for summary judgment, requesting that the court dismiss all of the remaining claims against them in this case. Dkt. 54. The Grays Harbor defendants contend that (1) Deputies Ramirez, Wells and Gay are entitled to qualified immunity on the federal constitutional claim for unlawful arrest because Mr. Henry has not shown that there was a constitutional violation or that any constitutional violation was clearly established; (2) Deputy Ramirez is entitled to qualified immunity on the federal constitutional claim for unlawful search at the time of arrest because there was no constitutional violation; (3) Deputies Wells and Gay are entitled to qualified immunity on the federal constitutional claim for unlawful search of Mr. Henry's house after he was arrested because a protective sweep of the house was warranted; (4) the existence of probable cause precludes the state law claim for unlawful arrest against Deputies Ramirez, Wells and Gay; (5) there is no state cause of action for wrongful search, either at the time of or after the arrest; (6) there is no state cause of action for denial of bail; (7) the negligence claim against Grays Harbor County fails due to lack of proximate cause; (8) the existence of probable cause is a complete defense to the false imprisonment claim; and (9) the claim for assault and battery against Deputy Ramirez should be

1 dismissed because there is no evidence of excessive force used to effect the arrest, and no

2 evidence of injury suffered during the arrest.  Dkt. 54.

3      On June 18, 2012, Mr. Henry filed a response opposing the motion for summary

4 judgment (Dkt. 62) and on June 20, 2012, he filed an amended response (Dkt. 66).  Mr. Henry

5 argues that multiple issues of fact preclude summary judgment, including whether probable

6 cause existed for the arrest; whether Deputy Ramirez entered Mr. Henry's home; whether Mr.

7 Henry was arrested before or after Deputy Ramirez entered Mr. Henry's home; and whether

8 Deputies Wells and Gay entered the home after Mr. Henry was arrested and had been placed in

9 the patrol car.  Mr. Henry argues that (1) Deputies Ramirez, Wells and Gay are not entitled to

10 qualified immunity under 42 U.S.C. § 1983 because they did not have probable cause to arrest

11 Mr. Henry; (2) Deputies Ramirez, Wells and Gay are not entitled to qualified immunity for the

12 arrest because they could not have believed that the arrest was lawful; (3) Deputy Ramirez is not

13 entitled to qualified immunity for following Mr. Henry into his home before he arrested Mr.

14 Henry; (4) Deputies Wells and Gay are not entitled to qualified immunity for unlawfully

15 searching Mr. Henry's house after Mr. Henry had been arrested and placed in the patrol car; (5)

16 the state law claim for unlawful arrest should proceed because probable cause to arrest did not

17 exist, as provided for in RCW 10.31.100; (6) state law tort claims exist for wrongful search

18 before or after arrest; (7) RCW 10.31.100 provides a cause of action for a state law tort claim of

19 denial of bail; (8) proximate cause exists to support a negligence claim against Grays Harbor

20 County; (9) because there was no probable cause to arrest Mr. Henry for felony harassment or

21 disorderly conduct, Mr. Henry's imprisonment was unlawful "and a violation of his

22 constitutional rights" (Dkt. 62, at 17); and (10) sufficient evidence has been presented to support

23 a claim for assault and battery against Deputy Ramirez.  Dkt. 66.

24

1    On June 22, 2012, the Grays Harbor defendants filed a reply, arguing that the deputies

2    obtained sworn statements from Mr. Atoch and Mr. Thompson before they contacted Mr. Henry;

3    that, whether or not Mr. Henry had been arrested when Deputy Ramirez allegedly followed Mr.

4    Henry into his house, Mr. Henry was seized on his front porch; a protective sweep after the arrest

5    was warranted by the circumstances; probable cause precludes a state claim for wrongful arrest;

6    there is no state tort claim for wrongful search before or after an arrest; there is no state tort

7    claim for denial of bail; the negligence claim fails due to lack of proximate cause; probable cause

8    precludes a claim for false imprisonment; the assault and battery claim against Deputy Ramirez

9    fails because the force used against Mr. Henry was not unnecessarily violent or excessive, and

10   Mr. Henry has produced no evidence that he was injured as a result of the alleged use of force.

11   Dkt. 68.

12                                    LEGAL STANDARD

13       Summary judgment is proper only if the pleadings, the discovery and disclosure materials

14   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

15   movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

16   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

17   showing on an essential element of a claim in the case on which the nonmoving party has the

18   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

19   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

20   for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

21   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

22   metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

23   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

24

1 requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

2 *Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

3 *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

4      The determination of the existence of a material fact is often a close question. The court

5 must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

6 e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect.*

7 *Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

8 of the nonmoving party only when the facts specifically attested by that party contradict facts

9 specifically attested by the moving party. The nonmoving party may not merely state that it will

10 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

11 to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

12 Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

13 be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

14 <u>DISCUSSION</u>

15 **1. Federal Constitutional Claims for Wrongful Arrest and Wrongful Search**

16      *Qualified Immunity.* The Grays Harbor defendants maintain that they are entitled to

17 qualified immunity for the federal constitutional claims of wrongful arrest, wrongful search at

18 the time of arrest, and wrongful search after the arrest.

19      Defendants in a Section 1983 action are entitled to qualified immunity from damages for

20 civil liability as long as their conduct does not violate clearly established statutory or

21 constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457

22 U.S. 800, 818 (1982). In analyzing a qualified immunity defense, the Court must determine: (1)

23 whether a constitutional right would have been violated on the facts alleged, taken in the light

24

most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. The privilege of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009)(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity also protects a defendant from having to bear the burdens of such pretrial matters as discovery. *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). *See also Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993). In analyzing a qualified immunity defense, courts are "permitted to exercise sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

*Violation of Fourth Amendment for Allegedly Wrongful Arrest.* Mr. Henry claims that Deputies Ramirez, Wells and Gay wrongfully arrested him without a warrant and without probable cause. This is apparently a claim under the Fourth Amendment to the U.S. Constitution. The Grays Harbor defendants maintain that they are entitled to qualified immunity on the wrongful arrest claim.

The first step in the qualified immunity analysis is to determine whether a constitutional right would be violated on the facts alleged.

The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. A claim for unlawful arrest is cognizable under 42 U.S.C. § 1983 as a

violation of the Fourth Amendment. *Dubner v. City & Cnty. of S.F.,* 266 F.3d 959, 964 (9th Cir.

2001); *accord Lacey v. Maricopa Cnty.*, 649 F.3d 1118, 1131 (9th Cir. 2011). The

"reasonableness" of a warrantless arrest is determined by the existence of probable cause. To

prevail on a Fourth Amendment unconstitutional arrest claim, a plaintiff must demonstrate that

the officers lacked probable cause to arrest him. *Norse v. City of Santa Cruz,* 629 F.3d 966, 978

(9th Cir. 2010). An officer has probable cause to arrest when the officer has knowledge of facts

and circumstances sufficient to cause a reasonable person to believe an offense has been

committed. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Henry v. United States*, 361 U.S. 98, 102

(1959); *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

Deputy Ramirez arrested Mr. Henry for felony harassment. RCW 9A.46.020 provides in

relevant part that a person is guilty of felony harassment if, without lawful authority, the person

knowingly threatens to cause bodily injury immediately or in the future to the person threatened

or to any other person (RCW 9A.46.020(1)(a)(i)) ; and the person by words or conduct places the

person threatened in reasonable fear that the threat will be carried out (RCW 9A.46.020(1)(b)).

RCW 9A.46.020(2) provides in relevant part as follows:

(2)(a)  Except as provided in (b) of this subsection, a person who harasses another is
guilty of a gross misdemeanor.

(b)  A person who harasses another is guilty of a class C felony if either of the following
applies:  (i)  The person has previously been convicted in this or any other state of any
crime of harassment, as defined in RCW 9A.46.060, of the same victim or members of
the victim's family or household or any other person specifically named in a no-contact
or no-harassment order; or (ii) the person harasses another person under subsection
(1)(a)(i) of this section by threatening to kill the person threatened or any other person.

Mr. Atoch told Deputies Ramirez, Wells and Gay that Mr. Henry had stated to him that,

if Mr. Thompson ever sets foot on the rodeo grounds again, Mr. Henry would shoot him and call

Mr. Atoch to come and pick up his body. Mr. Henry's statement was a threat to cause body

injury to Mr. Thompson. This was a threat to cause bodily injury in the future to another person. RCW 9A.46.020(1)(a)(i). Mr. Atoch told the deputies that he was frightened for himself and for Mr. Thompson. When Mr. Thompson learned of the threat, he was in fear that the threat would be carried out. Mr. Thompson, the person threatened, was in reasonable fear that the threat would be carried out. RCW 9A.46.020(1)(b). The crime could have been determined to be a felony because the threat, made to Mr. Atoch about Mr. Thompson, was a threat to kill the person threatened or any other person. RCW 9A.46.020(2)(b).

Mr. Henry maintains that he never threatened to kill anyone. Whether he did or not, the disputed statement was communicated to the deputies by Mr. Atoch. They reasonably relied on their conversations with and statements made by Mr. Atoch and Mr. Thompson.

Mr. Henry maintains that the deputies did not obtain Mr. Atoch or Mr. Thompson's statements until after they arrested Mr. Henry, and that the deputies did not have probable cause to arrest Mr. Henry when they did. The record does not support Mr. Henry's position. The deputies arrived at Oakville City Hall on February 19, 2010 at 9:41 a.m., and talked with Mr. Atoch and Mr. Thompson. Dkt. 23, at 4-5. Mr. Thompson's statement was taken at 10:00 a.m. (Dkt. 23, at 8), and Mr. Atoch's statement was taken at 10:22 a.m. (Dkt 23, at 6). Mr. Henry was arrested at 11:06 a.m., and booked into the jail at 11:40 a.m. Dkt. 69, at 3. Mr. Henry's statement that he could not have been arrested at 11:06 a.m. because the travel time between his home and the jail, in addition to the time he spent having lunch before being booked at 11:40 a.m., made it impossible for the deputies to have arrested Mr. Henry as late as they say they did. Mr. Henry's speculation to support his claim that the statements of Mr. Atoch and Mr. Thompson were not taken as noted on the statements does not create an issue of fact regarding when the statements were taken, when the deputies contacted Mr. Henry at his house, and when

1    they arrested him.  Further, Mr. Henry has cited no authority to support the proposition that a

2    written statement must be taken before deputies have probable cause to arrest.  At the very least,

3    the deputies talked with Mr. Atoch and Mr. Thompson, and then went out to Mr. Henry's home.

4         Mr. Henry also claims that Brandon Atoch's father was not present and could not have

5    heard Mr. Henry's conversation with Brandon Atoch.  On February 22, 2010, Mr. Atoch's father

6    signed a declaration that stated that he was in the house during the conversation between his son

7    and Mr. Henry, and that he heard Mr. Henry threaten to shoot Mr. Thompson if Mr. Thompson

8    went onto rodeo property.  Dkt. 27, at 7.  Mr. Atoch's father's statement is not relevant to

9    whether there was probable cause to arrest Mr. Henry, since that statement was obtained after the

10    arrest.

11         Finally, Mr. Henry contends that Officers Ramirez, Wells and Gay came to Mr. Henry's

12    house to talk to and obtain a statement from him, and that he was arrested only after he called

13    Officer Ramirez a "beaner."  The determination of probable cause is an objective test, and the

14    arresting officers' alleged subjective intent is irrelevant to that determination.  *See John v. City of*

15    *El Monte*, 515 F.3d 936, 940 (9th Cir. 2008)("Probable cause is an objective standard and the

16    officer's subjective intention in exercising his discretion to arrest is immaterial in judging

17    whether his actions were reasonable for Fourth Amendment Purposes.").  The court notes that

18    Mr. Henry argues in his response to the motion for summary judgment that the alleged ethnic

19    slur was the reason for the arrest, in retaliation for the slur, and that Deputy Ramirez did not

20    otherwise have probable cause to arrest Mr. Henry.  Dkt. 66, at 10.  As analyzed above, Deputy

21    Ramirez had probable cause to arrest Mr. Henry.  In the complaint, Mr. Henry did not allege a

22    First Amendment claim for retaliatory arrest; the claim was that defendants "made a warrantless

23

24

1    arrest without probable cause to support their arrest of Henry." Dkt. 1, at 10. It is not the role of

2    the court to create a cause of action for Mr. Henry.

3        A review of the record shows that the deputies had probable cause to arrest Mr. Henry for

4    felony harassment. There is no Fourth Amendment violation for unlawful arrest, based upon the

5    facts alleged. Accordingly, under the second part of the qualified immunity test, it was not

6    clearly established that it would have been clear to a reasonable officer that his conduct was

7    unlawful in the situation he confronted. Deputies Ramirez, Wells and Gay are entitled to

8    qualified immunity as to Mr. Henry's Fourth Amendment claim for unlawful arrest.

9        *Violation of Fourth Amendment for Wrongful Search at Time of Arrest.* The Grays

10    Harbor defendants request that the court grant qualified immunity for the alleged search by

11    Deputy Ramirez at the time of the arrest.

12        The first issue is whether there would be a constitutional violation on the facts alleged.

13        "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a

14    home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573,

15    586 (1980) (footnote omitted). The presumption of unconstitutionality that accompanies "the

16    [warrantless] entry into a home to conduct a search or make an arrest" may be overcome only by

17    showing "consent or exigent circumstances." *Steagald v. United States*, 451 U.S. 204, 211

18    (1981).

19        The Grays Harbor defendants claim that Mr. Henry was arrested before Deputy Ramirez

20    allegedly followed Mr. Henry into his house. Mr. Henry maintains that he was arrested after

21    Deputy Ramirez followed Mr. Henry into the house. Mr. Henry contends that he did not give

22    consent to Deputy Ramirez to follow him into the house.

23

24

The Grays Harbor defendants argue that the discussion between the deputies and Mr. Henry was a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), during which Mr. Henry was not free to leave; that Mr. Henry was therefore seized under the Fourth Amendment; and that Deputy Ramirez was justified in following Mr. Henry into his home.

A police officer may stop a person if the officer has a reasonable, articulable suspicion that the person has just committed a crime. *Terry v. Ohio, supra*. A suspect may be stopped "in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Floria*, 470 U.S. 811, 818 (1985).

With respect to consent, several circuits have held that, once an arrest is lawfully effected outside a person's residence, consent is not required for an officer to accompany an arrestee into his residence for purposes of obtaining identification. *See United States v. Berkowitz*, 927 F.2d 1376, 1389 (7th Cir.1991) (An "officer's authority to monitor a suspect does not depend on the suspect's consent; a suspect under arrest has no right to wander off on his own."); *U.S. v. Harness*, 453 F.3d 752, 756 (6th Cir.2006); *Watson v. City of Bonney Lake*, 2011 WL 2692963 *5 (W.D. Wash. 2011).

"It is a different matter, however, for the police to enter a person's home, without his consent, before announcing their authority to arrest. In that case, the arrestee has not forfeited his privacy interest in the home; he has not relinquished his right to close the door on the unwanted visitors." *United States v. Berkowitz*, 927 F.2d at 1387.

At this point, the Grays Harbor County defendants have not shown that they are entitled to qualified immunity. There are multiple questions of fact as to whether a constitutional right would have been violated in this case, and those facts are essential to a determination of whether the law was clearly established at the time of the incident. Notably, there are questions of fact as

to whether Mr. Henry was arrested before he entered the house to put on his shoes or whether he was arrested after Deputy Ramirez allegedly followed him into the house while he went inside to put on his shoes; whether the deputies were still questioning him about the incident when he decided to go back into the house or whether the questioning had concluded; whether, under the circumstances, Mr. Henry was free to terminate his interaction with the deputies; and whether the investigation/questioning of Mr. Henry was a brief investigatory stop within the scope of *Terry v. Ohio*.

Because the Grays Harbor County defendants have not shown at this point that they are entitled to qualified immunity on the claim that Deputy Ramirez conducted an unlawful search at the time of the arrest, the motion should be denied without prejudice.

*Violation of Fourth Amendment for Wrongful Search After Arrest*.  The Grays Harbor defendants request that the court grant qualified immunity for the alleged search by Deputies Wells and Gay after the arrest.

The Grays Harbor defendants contend that Deputy Wells went into Mr. Henry's home to try to locate medication, after Mr. Henry had requested it; and that Deputy Gay did not enter Mr. Henry's home after the arrest.  Two neighbors stated in declarations that they saw two deputies enter the home.  Mr. Henry denies that he gave the deputies consent to try to find his medication.

The Grays Harbor defendants maintain that the alleged entry could be justified under the "protective sweep" exception.  *Maryland v. Buie*, 494 U.S. 325, 327 (1990); *U.S. v. Lemus*, 582 F.3d 958 (9th Cir. 2009)(explaining that a "protective sweep incident to arrest" does not require reasonable suspicion or probable cause if area searched is adjacent to area of arrest and is one from which an attack could be launched).

1   The first issue is whether there would be a constitutional violation on the facts alleged.

2   The sequence of events, the timing of the alleged entry, the location of the parties at the time of

3   the alleged entry, whether the facts would support a reasonable suspicion of danger, and whether

4   Mr. Henry gave consent to the officers to enter the house are all factual issues that preclude the

5   court from determining at this stage that there would have been a constitutional violation.  A

6   determination related to those facts is necessary to determine whether the law was clearly

7   established at the time of the events.

8       The Grays Harbor defendants' motion, requesting qualified immunity for Deputies Wells

9   and Gay related to the search of Mr. Henry's home after the arrest should be denied without

10  prejudice.

11  **2.  State Law Claims for Wrongful Arrest, False Imprisonment, Wrongful Search,**

12  **Wrongful Denial of Bail, Negligence, and Assault and Battery**

13      *Wrongful Arrest and False Imprisonment.*  Mr. Henry has alleged a claim for wrongful

14  arrest and false imprisonment.  Probable cause is a complete defense to a claim of false arrest

15  and false imprisonment.  *Hanson v. Snohomish*, 121 Wn. 2d 552, 563 (1993); *McBride v. Walla*

16  *Walla Coun*ty, 95 Wn.App. 33, 38 (1999).

17      As discussed above, there was probable cause to arrest Mr. Henry for felony harassment.

18  Pursuant to RCW 10.31.100, a warrant was not required under State law.

19      The Grays Harbor County defendants' motion for summary judgment should be granted,

20  and the claims for wrongful arrest and false imprisonment should be dismissed.

21      *Search at Time of and After Arrest*.  Mr. Henry has alleged a claim for wrongful search

22  before and after his arrest.  The Grays Harbor County defendants maintain that there is no cause

23  of action for damages under state law for a wrongful search, citing *Eggleston v. Pierce County*,

24

ORDER ON GRAYS HARBOR COUNTY
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT- 18

148 Wn.2d 760, 769-70 (2003). In *Eggleston v. Pierce County*, the Washington Supreme Court determined that the Washington State Constitution's Eminent Domain provisions were not intended to apply to execution of a lawful search warrant.

*Eggleston* is factually distinguishable from the issues in this case. Nonetheless, Mr. Henry has pointed to no authority that authorizes him to pursue claims for wrongful search, based upon the facts of this case, viewed in the light most favorable to him. Accordingly, the Grays Harbor County defendants' motion for summary judgment on these claims should be granted and the state law claims for wrongful search at the time of and after Mr. Henry's arrest should be dismissed.

*Wrongful Denial of Bail.* Mr. Henry has alleged a claim for wrongful denial of bail, based upon Grays Harbor County's violation of RCW 10.31.030. The Grays Harbor defendants maintain that Mr. Henry was arrested under RCW 10.31.100, not RCW 10.31.030, and, in any event there is no cause of action for violating these statutory provisions.

RCW 10.31.030 applies to arrests under the authority of a warrant, in relevant part, as follows:

> PROVIDED FURTHER, That any officer making an arrest under this section shall, if the person arrested wishes to deposit bail, take such person directly and without delay before a judge or before an officer authorized to take the recognizance and justify and approve the bail, including the deposit of a sum of money equal to bail.

Mr. Henry maintains that he was not taken before a judge and offered the opportunity for bail. However, RCW 10.31.030 does not apply in this case, because Mr. Henry was arrested without a warrant. RCW 10.31.100 sets forth the procedures for an arrest without a warrant, and provides, in relevant part that "[a] police officer having probable cause to believe that a person has committed or is committing a felony shall have the authority to arrest the person without a

warrant." RCW 10.31.100 does not include a provision for bail, except in certain circumstances, none of which apply here. *See* RCW 10.31.100(2).

In sum, Mr. Henry has not shown that there is a cause of action for violation of RCW 10.31.030 or RCW 10.31.100.  The Grays Harbor County defendants' motion for summary judgment on this issue should be granted, and the claim for denial of bail should be dismissed.

*Negligence*.  Mr. Henry contends that  Grays Harbor County was negligent because, after he was booked into the jail, he missed three days of his blood pressure medication.  Defendants maintain that Mr. Henry has not submitted evidence that missing his medication caused him any harm.

In an action for negligence a plaintiff must prove four basic elements: (1) the existence of a duty; (2) breach of that duty; (3) resulting injury; and (4) proximate cause. *Degel v. Majestic Mobile Manor, Inc*., 129 W.2d 43, 48 (1996).

Mr. Henry argues that "(b)ut for plaintiff being denied his doctor-prescribed heart medications, plaintiff would not have suffered a heart attack.  It is reasonably foreseeable that an elderly man with an existing heart problem would be sensitive to missing three days of his doctor-prescribed heart medications and result in a heart attack." Dkt. 66, at 18.  In his declaration, Mr. Henry stated that "I believe that denial of access [to] my heart medications was the cause of my bodily injury since I was hospitalized and had to undergo heart surgery to repair my heart valve." Dkt. 29, at 5.

To satisfy proximate cause, a plaintiff must prove that the claimed harm would not have occurred but for the claimed negligence. *Miles v. Child Protective Servs*. Dep't, 102 Wn.App. 142, 159-60 (2000).

In his deposition, Mr. Henry testified that the medication was blood pressure pills, baby aspirin, and pain medication for his back. Dkt. 58, at 19. Mr. Henry stated that he missed his medication on February 19, 20, and 21, 2010, while he was in the jail. Dkt. 58, at 19. He later had an aortic valve replacement, and stated in his deposition that "the end result was open-heart surgery." Dkt. 58, at 20. Mr. Henry stated that he had not discussed the arrest and the absence of medication with any medical doctor, and that he had a "personal basis" for believing that the absence of medication was a contributing favor to his surgery. Dkt. 58, at 20.

"To prove a negligence cause of action, a plaintiff must establish causation. To do that, a plaintiff must produce evidence sufficient to support an inference that the claimed harm would not have occurred but for the claimed negligence." *Miles v. Child Protective Servs. Dep't*, 102 Wn.App. 142, 159-60 (2000). *Footnote omitted.* "Generally, in medical negligence cases, 'the plaintiffs must produce competent medical expert testimony establishing that the injury was proximately caused by a failure to comply with the applicable standard of care.'" *Rounds v. Nellcor Puritan Bennett Inc.*, 147 Wn.App. 155, 162 (2008) citing *Seybold v. Neu*, 105 Wn.App. 666, 676 (2001)). Mr. Henry has produced no evidence, other than his personal opinion, that the absence of blood pressure medication was the cause of his heart surgery. Mr. Henry has not shown that there is an issue of fact as to proximate cause. Defendants' motion for summary judgment should be granted as to this issue, and the claim for negligence against Grays Harbor should be dismissed.

*Assault and Battery.* Mr. Henry claims that Deputy Ramirez committed assault and battery when he "aggressively and forcefully subdued Henry", and Mr. Henry's back was injured. Dkt. 1, at 12.

1    Assault is committed when a person's actions or threats cause a victim apprehension of

2 imminent physical violence. *St. Michelle v. Robinson*, 52 Wash.App. 309, 313 (1988). The

3 common law definition of assault also includes unlawful touching with criminal intent or actual

4 battery. *State v. Wilson*, 125 Wash.2d 212, 217-18 (1994). A battery is the intentional infliction

5 of a harmful bodily contact upon another; and in order that any act may be done with the

6 intention of bringing about a harmful contact or an apprehension thereof to a particular person,

7 the act must be done for the purpose of causing the contact or apprehension or with knowledge

8 on the part of the actor that it is substantially certain to be produced. *See Garratt v. Dailey*, 56

9 Wn.2d 197, 200 (1955).

10    "Generally, a police officer making an arrest is justified in using sufficient force to

11 subdue a prisoner, however he becomes a tortfeasor and is liable as such for assault and battery if

12 unnecessary violence or excessive force is used in accomplishing the arrest. *Boyles v.*

13 *Kennewick*, 62 Wn.App. 174, 176 (1991).

14    Mr. Henry testified that Deputy Ramirez grabbed him by the arm and twisted it behind

15 his back, and then handcuffed him; that he twisted him arm up after he had been handcuffed and

16 shoved him toward the patrol car, and twisted his arms around and forced him into the back seat

17 of the patrol car. Construing all facts in favor of Mr. Henry, Deputy Ramirez's twisting Mr.

18 Henry's arms before applying handcuffs, while moving Mr. Henry to the patrol car, and while

19 placing him into the patrol car, could be sufficient to state a claim for assault and battery,

20 depending on the circumstances, for example, whether Mr. Henry was compliant after was

21 arrested. Mr. Henry has shown sufficient facts to state a claim for assault and battery against

22 Deputy Ramirez. The Grays Harbor County defendants' motion for summary judgment should

23 be denied, and the claim for assault and battery may proceed.

24

1

2     Accordingly, it is hereby **ORDERED** that Grays Harbor County Defendants' Motion for

3   Summary Judgment (Dkt. 54) is **GRANTED IN PART AND DENIED IN PART**, as follows:

4   (1) the motion is **GRANTED** as to Mr. Henry's claim under the United States Constitution for

5   wrongful arrest without a warrant and without probable cause against Deputies Gay, Wells and

6   Ramirez; the state law claim for wrongful arrest without a warrant; the state law claim for

7   wrongful search without a warrant by Deputy Ramirez before the arrest; the state law claim for

8   unlawful search after the arrest by Deputies Wells and Gay; the state law claim for denial of bail

9   against Grays Harbor County; the state law claim for false imprisonment; and the state law claim

10  for negligence against Grays Harbor County are **DISMISSED WITH PREJUDICE**; and (2) the

11  motion is **DENIED WITHOUT PREJUDICE** as to  the claim under the United States

12  Constitution for unlawful search by Deputy Ramirez before the arrest; the claim under the United

13  States Constitution for unlawful search by Deputies Wells and Gay after the arrest; and the state

14  law claim for assault and battery against Deputy Ramirez ; and these claims may proceed.

15     The Clerk is directed to send uncertified copies of this Order to all counsel of record and

16  to any party appearing *pro se* at said party's last known address.

17     Dated this 28th day of June, 2012.

18

19

20  ROBERT J. BRYAN
     United States District Judge

21

22

23

24